**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| STATE OF TEXAS,<br><br>          Plaintiff,<br><br>          v.<br><br>SNAP INC.,<br><br>          Defendant. | Case No.  4:26-cv-277<br><br>District Court of Collin County, Texas<br>Cause No. 366-00890-2026 |

**DEFENDANT SNAP INC.'S NOTICE OF REMOVAL**

Defendant Snap Inc. ("Snap") respectfully gives notice of the removal of the above-captioned action from the District Court of Collin County, Texas, to the United States District Court for the Eastern District of Texas pursuant to 28 U.S.C. §§ 1367, 1442, and 1446.  Removal is warranted under 28 U.S.C. § 1442(a)(1), which permits removal by "any person acting under [any] officer[] of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office[.]"  In support, Snap provides this short and plain statement of the grounds that entitle it to removal, as required under 28 U.S.C. § 1446(a).[1]

I.      **Factual Background**

1.      On February 11, 2026, the State of Texas, by and through the Attorney General of Texas, ("Plaintiff") filed its Petition ("Pet.") in the District Court for Collin County, Texas, in Texas's 366th Judicial District, Cause No. 366-00890-2026.

---

[1] In filing this Notice, Snap does not waive any right, defense, affirmative defense, or objection, including any challenges to venue and/or the exercise of personal jurisdiction.

1

2. Snap was formally served with the summons and Petition on February 26, 2026.

3. Plaintiff brings this twelve-count action under the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. § 17.41, *et seq.* (the "DTPA"), and the Securing Children Online through Parental Empowerment Act, Tex. Bus. & Com. Code Ann. § 509.001, *et seq.* (the "SCOPE Act").

4. Counts I through VIII of the Petition allege that Snap engaged in deceptive practices in violation of the DTPA by (a) inaccurately reporting to the Apple App Store that Snap's platform, Snapchat, contains no, mild, and/or infrequent mature content (including alcohol, tobacco, or drug use or references; sexual content or nudity; mature or suggestive themes; and profanity or crude humor) when such content is allegedly prevalent on Snapchat and permitted by Snap; (b) inaccurately representing to the Google Play and Microsoft Stores that Snapchat is appropriate for minors in order to obtain a "T" for "Teen" age rating when mature content is allegedly prevalent on Snapchat and permitted by Snap; (c) selecting and advertising a 12+ or 13+ age rating in the Apple App Store; (d) selecting and advertising a "T" for "Teen" age rating in the Google Play and Microsoft Stores; (e) omitting to the Apple App, Google Play, and Microsoft Stores facts about content available on Snapchat in order to select and advertise certain age ratings; and (f) making alleged public misrepresentations and omissions about the safety of Snapchat for minor users.

5. Count IX of the Petition alleges that Snap engaged in deceptive practices in violation of the DTPA by failing to disclose that Snapchat allegedly is addictive and contributes to compulsive or excessive use especially for minors.

6. Counts X through XII of the Petition allege that Snap violated the SCOPE Act by (a) failing to use a commercially reasonable method for parents or guardians to verify their identity and relationship to minor Snapchat users; (b) sharing, disclosing, and selling minors' personal

2

identifying information to third parties, and sharing and disclosing minors' personal identifying information to other users, without permission from a verified parent; and (c) failing to provide verified parents with parental tools to supervise minors' accounts, including tools to control or limit the minor's privacy or account settings.

7.    Plaintiff's claims threaten to interfere with Snap's ability to carry out its responsibilities under federal officers, including officers from the U.S. Department of Homeland Security ("DHS") and the U.S. Food and Drug Administration ("FDA").  Those agencies work with Snap to ensure that important public service messages reach 13- to 17-year-olds on Snapchat.

8.    Plaintiff's claims seek to penalize Snap for conduct related to its work assisting the federal government in accomplishing its goals of reaching teenage audiences, and the Plaintiff's requested injunctive relief would necessarily impair Snap's ability to facilitate the federal government's messaging to those target audiences.

9.    Snapchat is an important platform for federal agencies to utilize when carrying out their duties to engage with teen audiences and disseminate critical health, safety, and well-being messaging.  Snapchat has a broad reach among teenagers, and it permits teenagers starting at age 13 to sign up for its services.  According to the Petition, "millions of young people in the United States" have Snapchat accounts, including more than half of the country's teenagers.  Pet. ¶ 44. Federal agencies seeking to reach teenagers on important issues of health, safety, and well-being engage with Snap to use its platform in order to reach a substantial share of their targeted audience.

**A.  Department of Homeland Security Know2Protect and Pledge2Protect Campaigns**

10.    Snap assists DHS as part of the Know2Protect and Pledge2Protect campaigns, with Know2Protect being the first-of-its-kind federal campaign dedicated to educating teenagers and adults about online safety risks and specifically preventing online sexual exploitation and abuse.

Pledge2Protect is the official call-to-action for Know2Protect, which encourages people, including minors, to take action and educate themselves concerning online child exploitation and preventative measures.

11.    DHS carries out these campaigns in furtherance of its child exploitation prevention responsibilities under 6 U.S.C. § 473.  DHS's public communications about the Know2Protect campaign explain that the agency engaged Snap specifically because of its ability to "spread awareness to one of the campaign's key audiences: teens" and to engage teens "directly" on a platform that "resonates strongly with teens."  DHS, *DHS Know2Protect and Snap Inc. Launch Innovative Virtual Resource to Educate Teens About Online Harms* (Oct. 1, 2024) ("DHS Press Release").[2]  DHS also publishes a "social media toolkit," which explains how people, including minors, can use online platforms like Snapchat to inspire each other to take the Pledge2Protect and share it with others "far and wide" to create "a ripple effect of awareness, action and change" and "a wave of safety in the digital world."  DHS, *Know2Protect Social Media Toolkit* (last updated Aug. 12, 2025).[3]

12.    Since 2024, Snap has entered into Memoranda of Understanding ("MOUs") with the Child Exploitation Investigations Unit of DHS's Cyber Crimes Center.  These MOUs set the framework for Snap's efforts in assisting DHS with the development, scaling, and promotion of the Know2Protect and Pledge2Protect campaigns.

13.    Snap has assisted DHS with the Know2Protect and Pledge2Protect campaigns by conducting research on young adults' awareness of and familiarity with various risks of child sexual exploitation and abuse online, including research focused on teens aged 13 to 17.  This research helps inform the development and operation of the federal government's campaign.

---

[2] Available at https://perma.cc/6LEW-277X.
[3] Available at https://perma.cc/F6JG-SCCG.

14.    DHS furthers its goals by "leveraging Snapchat's interactive features."  DHS Press Release.  For example, pursuant to the MOUs, Snap assisted DHS with building two custom "lenses" (one for each campaign), which are features unique to Snapchat that allow users to add interactive animations to photos and videos.

15.    The Know2Protect lens "is designed to engage teens through a fun and interactive quiz" that asks questions about online safety and how to prevent online harm.  *Id.*  The Know2Protect lens makes this educational process "an entertaining adventure": users can create videos of themselves taking the quiz, use Snapchat's other interactive features to add effects, animations, and personalization to their video, and then share their video with friends and family.  *Id.*  Through the Know2Protect lens, DHS explains that it can "bring important online safety information to [the teen] community directly."  *Id.*

16.    The Pledge2Protect lens dresses users' personalized avatars (known as "Bitmojis") in a custom t-shirt that reads "Take the Pledge2Protect" and includes the Pledge2Protect campaign logo and the web address for the Know2Protect website.  Users who take the pledge are encouraged to use the lens to share their dressed Bitmoji with friends or family.  A QR code specific to the Snapchat platform, which brings users directly to the lens, is displayed on the Know2Protect website.[4]

17.    Snap assists both DHS and its advertising contractor to ensure the Know2Protect and Pledge2Protect projects operate according to DHS's objectives.  Snap connected DHS and its contractor to a longtime production partner to build the Know2Protect and Pledge2Protect lenses for the platform.  DHS's contractor coordinated directly with the production partner on lens development, revisions, and feedback cycles, while Snap and DHS met intermittently to discuss

---

[4] Available at https://perma.cc/H9KZ-N892.

the campaigns.  DHS approved the final content of the Know2Protect lens, which launched in October 2024.  The Pledge2Protect lens launched in August 2025.

18.     Following the success of the Know2Protect lens in reaching and engaging the targeted teen audience, DHS entered into another MOU with Snap, which ran through December 2025 and included the Pledge2Protect effort.

19.     Additionally, DHS utilizes in-app advertisements to promote Know2Protect using advertising credits provided by Snap.  DHS has used many of those credits to target teens aged 13 to 17.  DHS uses those credits to amplify the reach of the campaigns, including to promote the Know2Protect and Pledge2Protect lenses and to connect users to campaign "call to action" video advertisements that DHS produced.  DHS dictates the "placement" of the Know2Protect and Pledge2Protect advertisements by selecting where and how the advertisements are displayed on the Snapchat application.  Snap implements DHS's request to target campaigns to teen users aged 13 to 17, resulting in a high number of "impressions" (user views) among that target audience.

**B.  Department of Homeland Security Blue Campaign**

20.     Snap also facilitates the promotion of DHS's Blue Campaign, a national public awareness campaign located within the DHS Center for Countering Human Trafficking that is aimed at educating the public about the indicators of human trafficking and how to combat it.  DHS carries out this campaign in furtherance of its human trafficking prevention responsibilities under 6 U.S.C. §§ 242 and 242a.  As part of the Blue Campaign, DHS publishes materials designed to help "reach those considered vulnerable to exploitation and human trafficking: youth."  Blue Campaign, *How To Talk to Youth About Human Trafficking* 1 (June 5, 2025).[5]

---

[5] Available at https://perma.cc/W2PL-LEFK.

21.    In 2024 and 2025, DHS utilized in-app advertisements to promote the Blue Campaign.  DHS uses Snapchat to amplify the reach of the Blue Campaign, including by connecting users to Blue Campaign advertisements produced by DHS.  DHS dictates the "placement" of the Blue Campaign advertisements by selecting where and how the advertisements are displayed on the Snapchat application.  Snap also implements DHS's request to target young users, including those aged 13 to 17, resulting in a high number of impressions among that target audience.  Most recently, Snap implemented the Blue Campaign's 2025 back-to-school initiative to increase awareness around human trafficking, including by targeting teen users aged 13 to 17.

### C.  Food and Drug Administration Public Health Campaigns

22.    Snap has worked with the FDA for years to implement the Center for Tobacco Products' public health campaigns, many of which target teen audiences aged 13 to 17.  The FDA's Center for Tobacco Products utilizes Snap to fulfill its statutory duties to reach teen users with important messages about the risks of vaping and cigarette use.   21 U.S.C. §§ 387a(e), 393(d)(2)(D).

23.    These Center for Tobacco Products public health campaigns include "The Real Cost" and "Next Legends."  The Real Cost campaign seeks to reach U.S. teenagers, including teenagers under the age of 18, with public health messages about the risks of tobacco and nicotine use.  The FDA specifically engages platforms like Snapchat because it recognizes that frequent engagement with youth through the internet "helps broaden the campaign's reach and creates spaces for teens to engage in peer-to-peer conversations about tobacco use in ways that are authentic to who they are."  The Center for Tobacco Products, *The Real Cost: Campaign Overview*

2 (Jan. 2018).[6]  The Next Legends campaign was designed to educate American Indian/Alaska Native teenagers, including those under the age of 18, about the harms of vaping.

24.    Snap assisted the FDA with building multiple custom The Real Cost and Next Legends lenses, which, like the Know2Protect and Pledge2Protect lenses, are features unique to Snapchat.   These interactive lenses have animations that provide facts about the dangers of cigarette and vape use when users engage with the lens.  Users can create a video of themselves using the lenses; use Snapchat's other interactive features to add effects, animations, and personalization to their video; and then share their video with friends and family.

25.    The FDA has also utilized in-app advertisements to promote initiatives like The Real Cost and Next Legends.  Snap assists the FDA with amplifying the reach of its public health campaigns to teenage audiences, including by connecting users to in-app advertisements produced by the FDA.  The FDA dictates the "placement" of these advertisements by selecting where and how the advertisements are displayed on the Snapchat application.  Snap also implements the FDA's request to target in-app advertisements to teen users aged 13 to 17.

26.    The FDA contracts with a media agency to coordinate its public outreach campaigns on Snapchat.  The media agency operates the FDA's account on Snap's advertiser platform and has agreed to the self-serve advertiser platform contract on behalf of the FDA.  The FDA, through its media agents, sends detailed campaign briefs to Snap that outline the agency's campaign goals and objectives.  During active FDA campaigns, Snap meets with the FDA's media agency to ensure the campaign performs according to these goals and objectives.  These meetings also serve as an opportunity for Snap to receive client feedback on how to better assist the FDA in reaching its campaign goals.

---

[6] Available at https://perma.cc/7UE8-4P4U.

## II.    Removal Standard

27.    "A civil action . . . that is commenced in a State court . . . may be removed by [a defendant] to the district court of the United States for the district and division embracing the place wherein it is pending" when it is "against or directed to" "any person acting under [an] officer[] of the United States or of any agency thereof . . . for relating to any act under color of such office[.]" 28 U.S.C. § 1442(a)(1).

28.    A removing defendant must, within thirty days of service of the initial pleading, file a notice of removal "containing a short and plain statement of the grounds for removal, together with a copy of all process, pleadings, and orders served upon such defendant or defendants in such action." 28 U.S.C. § 1446(a)–(b).

## III.    Venue

29.    Removal to this Court is proper under 28 U.S.C. §§ 1442(a) and 1446(a) because this Court is the United States District Court for the district in which the state court action is pending. *See* 28 U.S.C. § 124(c)(3).

## IV.    Bases for Removal

### A. This Court Has Jurisdiction Over Plaintiff's Claims Under the Federal Officer Removal Statute

30.    Under the federal officer removal statute, a private defendant may remove a case under § 1442(a)(1) if four elements are met. *Plaquemines Par. v. BP Am. Prod. Co.*, 103 F.4th 324, 333 (5th Cir. 2024), *cert. granted sub nom.*, *Chevron USA Inc. v. Plaquemines Par.*, 145 S. Ct. 2792 (2025). The federal officer removal statute is unlike other removal statutes and is "broadly construed in favor of a federal forum." *Williams v. Lockheed Martin Corp.*, 990 F.3d 852, 859 (5th Cir. 2021) (internal quotation marks and citation omitted); *Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, 2023 WL 2573914, at *2 (5th Cir. Mar. 20, 2023) (per curiam).

9

31.    *First*, the defendant must assert a colorable federal defense. *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020) (en banc).  It is the "raising of a federal question" in the defendant's "removal petition that constitutes the federal law" that "support[s] Art[icle] III 'arising under' jurisdiction." *Mesa v. California*, 489 U.S. 121, 136 (1989).  Thus, even where there is a "nonfederal cast [to] the complaint[,] the federal-question element is met if the defense depends on federal law." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999).  The Supreme Court has explicitly "rejected a narrow, grudging interpretation" of the colorable federal defense requirement.  *Id.* (internal quotation marks and citation omitted).  Rather, a colorable federal defense need only be plausible; a defendant need not have a "sustainable defense" or to "win his case before he can have it removed." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *Latiolais*, 951 F.3d at 296–97.  A federal defense is colorable so long as it is not "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous." *Latiolais*, 951 F.3d at 297 (citation omitted).

32.    *Second*, the removing defendant must be a "person" under the removal statute. *Id.* at 291.  It has long been recognized that the removal statute "applies to private persons and corporate entities 'who lawfully assist the federal officer in the performance of his official duty.'" *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 461 (5th Cir. 2016) (quoting *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 151 (2007)), *overruled on other grounds by Latiolais*, 951 F.3d at 296; *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 201 (5th Cir. 2019); *see also* 1 U.S.C. § 1 (defining "person" to include "corporations").  Whether the removing defendant is a "person" under the statute may therefore be "the easiest inquiry" in the removal analysis. *Savoie*, 817 F.3d at 462.

10

33.     ***Third***, the defendant must show that it "acted pursuant to a federal officer's directions." *Latiolais*, 951 F.3d at 296.  This prong is also referred to as the "acting under" requirement.  *See Plaquemines*, 103 F.4th at 334.  The Supreme Court instructs courts to "liberally construe[]" the "broad" phrase "acting under." *Watson*, 551 U.S. at 147 (internal quotation marks and citation omitted).  Defendants satisfy the "acting under" requirement where their "effort[s were] to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 152 (emphasis in original).  Defendants must show that "a federal officer exerted 'a sufficient level of subjection, guidance, or control over'" them. *Plaquemines*, 103 F.4th at 334 (quoting *St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.*, 990 F.3d 447, 455 (5th Cir. 2021)). In contrast, "simply *complying* with the law," even where a business is subject to a detailed regulatory scheme, does not satisfy the first prong under § 1442(a)(1).  *Watson*, 551 U.S. at 152 (emphasis in original).

34.     ***Fourth***, the defendant must show that the challenged conduct is "connected or associated with an act pursuant to a federal officer's directions." *Latiolais*, 951 F.3d at 296.  This principle is derived from the text of the federal officer removal statute, which was broadened by Congress in 2011 to allow for removal of "a civil action *relating to* an act under color of federal office." *Id.* at 292 (emphasis in original).  The phrase "relating to" is given broad interpretation. *Id.*

35.     Plaintiff's claims under the DTPA and the SCOPE Act are removable based on Snap's work assisting federal agencies by delivering their public messaging to Snapchat users aged 13 through 17, most notably under DHS's Know2Protect and Pledge2Protect programs, DHS's Blue Campaign, and the FDA's public health campaigns.

## 1.  Snap's Anticipated and Well-Founded Federal Defenses Are Certainly Colorable

36.    Snap plans to raise multiple federal defenses to Plaintiff's claims under the DTPA and the SCOPE Act that are plainly colorable, including defenses under the First Amendment of the U.S. Constitution and Section 230 of the Communications Decency Act (the "CDA").[7]

37.    ***First***, the First Amendment bars Plaintiff's claims under the DTPA, including because they seek to compel Snap to disclose "highly subjective opinions about content-related harms to children." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122 (9th Cir. 2024).  For example, Plaintiff seeks to hold Snap liable for failure to disclose to phone application stores and consumers the true amount of what it refers to as "explicit adult content" available on Snapchat.  *See* Pet. ¶¶ 209–15.  In doing so, Plaintiff alleges that Snap represented this vague category of content (which is itself defined by several vague subcategories of content) is "infrequent" or "mild." Plaintiff also seeks to hold Snap liable for failure to disclose that Snapchat (allegedly) is addictive and contributes to compulsive or excessive use by minors and mental health problems.  *See* Pet. ¶¶ 216–21.  What is "explicit adult content," what is frequent or infrequent, what is addictive, and, ultimately, what content is appropriate for children of different ages are all highly subjective inquiries.  Laws that attempt to "deputize private actors into determining whether material is suitable for kids" contravene the First Amendment.  *Bonta*, 113 F.4th at 1118.

38.    Moreover, the allegations supporting Plaintiff's DTPA claims target certain features that can incorporate Snap's own speech, including notifications, rewards, charms, and lenses.  *See* Pet. ¶¶ 113–35.  These aspects of Plaintiff's claims are barred by the First Amendment because they seek to punish Snap for the content of its speech.  *See Moody v. NetChoice, LLC*, 603

---

[7] Snap identifies these defenses as examples for jurisdictional purposes and reserves all rights to raise other defenses in this litigation.

U.S. 707, 716–17 (2024) (the First Amendment protects internet platforms that "produce their own distinctive compilations of expression" including by "mak[ing] choices about what third-party speech to display and how to display it"); *id.* at 719 ("[T]he First Amendment . . . does not go on leave when social media are involved."); *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 837 (N.D. Cal. 2023); *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 700–03 (N.D. Ill. 2025).

39.     The First Amendment also bars Plaintiff's SCOPE Act claims because the Act is content-based and is not narrowly tailored to serve compelling state interests.  The SCOPE Act applies only to digital services providers that "connect[] users in a manner that allows users to socially interact with other users," Tex. Bus. & Com. Code Ann. § 509.002(a)(1), and explicitly exempts digital service providers whose services "primarily function[] to provide a user with access to news, sports, commerce, or content primarily generated or selected by the digital service provider," *id.* § 509.002(b)(10)(A).  Thus, if Snap had made different editorial judgments about what content is permitted or promoted on its platform, it would not be subject to the requirements of the Act that Plaintiff seeks to enforce.  Such content-based laws "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).  The statutory provisions underlying Plaintiff's SCOPE Act claims are not narrowly tailored and cannot survive strict scrutiny.

40.     Nor can the SCOPE Act claims survive even intermediate scrutiny.  The requirements Plaintiff seeks to impose would burden speech substantially more than is necessary to further any state interest.  *See Packingham v. North Carolina*, 582 U.S. 98, 105–06 (2017); *NetChoice v. Murrill*, F. Supp. 3d, 2025 WL 3634112, at *34, *36 (M.D. La. Dec. 15, 2025).

13

41.     *Second*, Section 230 of the CDA specifically provides that "[n]o provider . . . of an interactive computer service shall be treated as the publisher or speaker" of content provided by a third party.  47 U.S.C. § 230(c)(1).  Section 230 thus provides "broad immunity . . . to Web-based service providers for all claims stemming from their publication of information created by third parties."  *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).

42.     Although Plaintiff stylizes its DTPA claims as attacking misrepresentations, omissions, failures to disclose, and design features, these claims implicate Snap's role as a publisher of third-party content and are barred by Section 230.  *See, e.g.*, *Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025); Pet. ¶ 186 (alleging that Snap has "deliberately permitted mature, adult-only content on Snapchat"); Pet. ¶ 211 (alleging that "Snap permits or promotes" the types of content at issue in the DTPA claims).  Not only would DTPA liability be premised on "second-guessing" of Snap's editorial decisions, but the representations and warnings that Plaintiff argues are necessary "would only be necessary because of [Snap]'s allegedly inadequate policing of third-party content."  *In re Facebook, Inc.*, 625 S.W.3d 80, 93–94 (Tex. 2021); *see also id.* at 94 ("[A] warning about third-party content is a form of editing, just as much as a disclaimer printed at the top of a page of classified ads in a newspaper would be." (citation omitted)).

43.     Moreover, Plaintiff's SCOPE Act claims are similarly barred by Section 230. Although these claims—including the claim that Snap failed to properly allow for "accounts for minors to be linked to those of adults"—are largely "couched as complaints about [Snap]'s design and operation of its platform[] rather than its role as a publisher of third-party content," Snap's "alleged lack of safety features is only relevant . . . to the extent that such features would have averted wrongful communication via [Snap]'s platform[] by third parties."  *Id.* at 93–94 (citation modified).

**2. Snap Is Plainly a Person Within the Meaning of the Removal Statute**

44.    Snap is a corporate entity that, as described below, assists federal agencies in the performance of their official duties, including the execution of their public safety and health education and outreach initiatives. *See Savoie*, 817 F.3d at 461.  Snap therefore falls squarely within the definition of "person" for purposes of the federal removal statute.

**3. Snap Implements the Campaigns Under the Direction of Federal Agencies**

45.    *First*, Snap is "acting under" DHS, a federal agency, in the Know2Protect and Pledge2Protect campaigns.  DHS is statutorily required to conduct "outreach and training activities" concerning child exploitation in "collaborat[ion] with other governmental, nongovernmental, and nonprofit entities approved by the Secretary." 6 U.S.C. § 473(b)(2)(F). Through the Know2Protect and Pledge2Protect campaigns, Snap is acting "to *assist*, or to help *carry out*," these statutorily mandated duties and tasks of DHS and its officers, "the federal superior." *Watson*, 551 U.S. at 152 (emphasis in original).  Snap therefore assists DHS with services DHS would be statutorily required to provide itself in the absence of a private contract. *Caris MPI, Inc. v. UnitedHealthcare, Inc.*, 108 F.4th 340, 348 (5th Cir. 2024).

46.    When Snap acted under its agreement with DHS to perform services and make products for the government, Snap did so under the "guidance" of DHS. *Plaquemines*, 103 F.4th at 334. DHS signed MOUs with Snap in 2024 and 2025 to guide Snap's work on the Know2Protect and Pledge2Protect campaigns.  DHS controlled the content of the Know2Protect and Pledge2Protect lenses, met with Snap repeatedly during the lens development processes, and exercised final approval over the Know2Protect and Pledge2Protect lenses before launch.  DHS determines how to target its advertising and promotion on Snapchat, including by selecting where on the platform its advertisements are displayed to users, and DHS has chosen to target much of

15

its advertising with respect to the Know2Protect and Pledge2Protect programs at users aged 13 to 17.

47.    ***Second***, Snap is "acting under" DHS by assisting DHS and its officers with advertising its Blue Campaign content to the agency's chosen audience, including users aged 13 to 17.  DHS is statutorily required to "operate the Blue Campaign's nationwide public awareness effort and any other awareness efforts needed to . . . prevent human trafficking" and "coordinate external engagement . . . regarding human trafficking with critical partners, including . . . corporations."  6 U.S.C. § 242a(c)(4)–(5); *see also* 6 U.S.C. § 242(e)(7) (requiring the Blue Campaign to "provide guidance and training" to DHS concerning "leveraging partnerships with . . . private sector organizations to raise public awareness of human trafficking").  When Snap works with DHS's Blue Campaign, it is acting "to *assist*, or to help *carry out*," these statutorily mandated duties and tasks of DHS, a federal superior.  *Watson*, 551 U.S. at 152 (emphasis in original).  Snap therefore assists DHS with efforts that DHS would be statutorily required to perform absent Snap's involvement.

48.    Snap's acts for the Blue Campaign were under the "guidance" of DHS and its officers.  *Plaquemines*, 103 F.4th at 334.  DHS determines how to target its advertising and promotions on Snapchat, including by selecting where on the platform its advertisements are displayed to users.  DHS also chooses to target campaigns on Snapchat to young users, including those aged 13 to 17, and exercises control over the contents of the Blue Campaign's advertisements.

49.    ***Third***, Snap is "acting under" the FDA's federal authority by assisting the FDA and its officers with advertising the FDA's anti-smoking and vaping campaigns to the agency's chosen audience of teen users, including users aged 13 to 17.  The FDA is statutorily required to "conduct[]

16

educational and public information programs relating to [its] responsibilities," 21 U.S.C. § 393(d)(2)(D), which include implementing the 2009 Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387a(e).  A key objective of that Act is "reducing the use of tobacco by minors" to reduce premature deaths.  Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, § 2(14), 123 Stat. 1776, 1777 (2009).  Thus, when Snap works with the FDA on its anti-tobacco public health campaigns targeting teens, Snap is acting "to *assist*, or to help *carry out*" these statutorily mandated duties and tasks of the FDA, as the federal superior.  *Watson*, 551 U.S. at 152 (emphasis in original).  In other words, Snap assists the FDA with services that the FDA would be statutorily required to perform itself in the absence of a private contract.  *Caris MPI*, 108 F.4th at 348.

50.    As with its work with DHS, Snap's assistance with the Center for Tobacco Product's public health campaigns were under the "guidance" of the FDA.  *Plaquemines*, 103 F.4th at 334.  The FDA provides Snap with detailed campaign briefs to guide Snap's work and determines how to target its advertising and promotions on Snapchat, including by selecting where on the platform its advertisements are displayed to users.  The FDA has chosen to target some of its campaigns on Snapchat exclusively to users aged 13 to 17, and the FDA exercises control over the contents of its campaigns and its interactive lenses.  Additionally, Snap's frequent meetings with the FDA's media agency during active campaigns ensure that the campaign is guided by the FDA's feedback.

### 4.  Plaintiff's Claims Are Connected to Government-Directed Conduct

51.    Plaintiff's DTPA and SCOPE Act claims relate to, and have a clear connection and association with, Snap's implementation of these federal programs.

17

52.    *First*, the Petition alleges that Snap violates DTPA in part because it "hosts enormous amounts of mature content."  Pet. ¶ 46.  Highlighting the grave First Amendment concerns raised by the Petition, this broad (and poorly-defined) category of content could easily be understood to reach the content of the DHS and FDA programs implemented by Snap.

53.    For instance, the Petition defines "mature/suggestive themes" to mean "complex themes that are suitable only for adult audiences," including a catchall category of "other dangerous behavior."  Pet. ¶ 74.  This could easily be understood to encompass the Know2Protect, Pledge2Protect, and Blue Campaign initiatives, including the Know2Protect and Pledge2Protect lenses, which are interactive features that include content related to the sexual abuse and exploitation of minors.

54.    The DTPA claims are also based in part on alleged "tobacco, and drug use *or references*" on Snapchat.  Pet. ¶ 57 (emphasis added).  By targeting content that merely "references" tobacco and drugs, this category encompasses certain elements of the FDA's advertisements, including interactive The Real Cost and Next Legends lenses which include content related to cigarettes, vaping, and nicotine.

55.    *Second*, Plaintiff's DTPA claims rely on allegations that Snap "knowingly deceives Texas consumers about the damage its app causes to young users" because it "designed its app to be highly addictive, especially to children and teens."  Pet. ¶ 3; *see also* Pet. ¶¶ 216–21.  The allegedly addictive features include algorithms used to recommend and deliver content to users, Pet. ¶ 131, such as through Snap's "Stories," "Spotlight," and "Discover" features, Pet. ¶¶ 32, 38–39.

56.    Snap relies on these features to assist DHS and the FDA in implementing their programs, including to ensure that the federal agencies' programs reach their target audience,

18

which includes teens under 18, and to maximize user impressions for these programs. In some instances, the agencies affirmatively selected to have their advertisements displayed through these features.

57.    ***Third***, Plaintiff's SCOPE Act claims relate to the work that Snap conducts in assisting DHS and the FDA because they seek to hold Snap liable for not taking actions that would interfere with minor teens' access to Snapchat. This interference is underscored by the fact that the agencies rely on the platform's large teen user base and its ability to reach a broad population of American teens, including Texas residents. Specifically, requiring parent verification for all minor Texas users in order for them to use Snapchat would necessarily limit their access to the platform and the federal government's public safety and health messaging. Similarly, the injunctive relief that Plaintiff seeks would make it more difficult for Texas teens to access the Snapchat platform (either at all or to the full extent), and to receive the federal government's public safety and health messaging. This directly interferes with Snap's efforts in assisting DHS and the FDA in carrying out their statutory duties and reaching their targeted teen audiences.

**B.    This Court Has Supplemental Jurisdiction Under Sections 1442(a)(1) and 1367**

58.    As Snap has explained, this Court has jurisdiction under the federal officer removal statute over both Plaintiff's DTPA and SCOPE Act claims. To the extent the Court finds that statute creates original jurisdiction for only some of the claims, however, the Court still has supplemental jurisdiction over the remaining claims under §§ 1442(a)(1) and 1367.

59.    When a defendant removes a § 1442(a)(1) case, courts exercise supplemental jurisdiction over any remaining state law claims against the defendant so as to transfer the entire "civil action." § 1442(a). "Because Section 1442(a)(1) authorizes removal of the entire action even if only one of the controversies it raises involves [acts done under] a federal officer or agency,

19

the section creates a species of statutorily-mandated supplemental subject-matter jurisdiction." 14C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3726 (rev. 4th ed. 2025).

60.     This Court can also exercise supplemental jurisdiction under § 1367, because all twelve counts are "so related . . . that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  State and federal claims are so related when "they 'derive from a common nucleus of operative fact.'"  *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)).  This standard is satisfied where, like here, "both the federal and state claims on the face of the pleadings concern the same core factual issue." *Id.*; *see also Baker v. City of McKinney, Tex.*, 571 F. Supp. 3d 625, 631–32 (E.D. Tex. 2021). Supplemental jurisdiction should be exercised where, like here, it serves "judicial economy and convenience to the parties" and where doing so "prevents duplicative discovery efforts and other unnecessary hardships," including because "the same witnesses are involved in both the federal and state claims." *S.N.B. v. Pearland Indep. Sch. Dist.*, 120 F. Supp. 3d 620, 630 (S.D. Tex. 2014).

61.     Plaintiff's claims all arise from the same factual allegations outlined in paragraphs 1 to 148 of the Petition.  At their core, each of the claims concerns Snapchat's conduct with respect to providing a platform available to minor teen users and whether Snap is taking sufficient steps to reduce the risks of harm to them.  For example, each of Plaintiff's DTPA claims alleges that Snap made misrepresentations or omissions to application stores and consumers that are "highly relevant" to users' decisions to download—or parents' decisions to allow minors to use—Snapchat because they impact value judgments about whether the platform is appropriate for children.  Pet. ¶¶ 164, 170, 176, 182, 190, 198, 208, 215, 221.  And all three of Plaintiff's SCOPE Act claims are based on the premise that Snapchat is inappropriate for minors because Snap has failed "to

implement specific safety and privacy features to protect users under the age of 18." Pet. ¶ 155. The Petition also states that the three alleged violations of the SCOPE Act are per se violations of the DTPA. Pet. ¶¶ 226, 231, 235. Thus, as framed in the Petition, Plaintiff contends that the question of whether Snap violated the SCOPE Act overlaps with the question of whether Snap violated the DTPA.

62.     Further, the DTPA claims, including those focused on age ratings and the claim focused on the alleged addictiveness of Snapchat and its features, are all interconnected because they rely on allegations about the way content is delivered to Snapchat users. *See, e.g.*, Pet. ¶ 2 (alleging that Snap recommends mature, sexual, and other content to teen users); Pet. ¶ 131 (alleging that Snap uses algorithms to recommend to teen users "content that maximizes the amount of time users spend on the platform," thereby promoting "behavioral addiction"). For instance, Plaintiff alleges that content ephemerality—described by Plaintiff as one of Snapchat's "hallmark features," Pet. ¶ 3—both enables illegal, sexual, and dangerous conduct that makes Snapchat's age ratings deceptive, Pet. ¶¶ 67, 99–101, and leads to addiction, Pet. ¶¶ 3, 122–23.

## V.     Snap Has Complied with All Procedural Requirements for Removal

63.     Snap has satisfied the procedural requirements for removal under 28 U.S.C. § 1446.

64.     As required by § 1446(a), Snap is filing this Notice of Removal in the United States District Court for the Eastern District of Texas. The state court where this action was commenced, the District Court for Collin County, Texas, in Texas's 366th Judicial District, is within this federal judicial district and division.

65.     The Notice of Removal is signed pursuant to Fed. R. Civ. P. 11.

21

66.    Plaintiff served the summons and the Petition on February 26, 2026, which was less than 30 days ago. Therefore, removal is timely under § 1446(b)(1). *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354 (1999).

67.    A copy of "all process, pleadings, and orders served upon such defendant . . . in such action" are attached to this Notice of Removal as Exhibits A to C, as required by 28 U.S.C. § 1446(a).[8]

68.    Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on Plaintiff's counsel and filed with the state court clerk contemporaneously with the filing of this Notice of Removal.

69.    Snap reserves all rights. Nothing herein should be construed as a waiver or relinquishment of any of Snap's rights, defenses, or remedies.

WHEREFORE, Defendant Snap Inc. respectfully gives notice that the above-captioned litigation has been removed from the District Court for Collin County, Texas, in Texas's 366th Judicial District, to the United States District Court for the Eastern District of Texas.

---

[8] Snap has not yet received an unredacted copy of the Petition filed in state court. Snap, however, intends to move to seal and/or redact certain filings that were redacted in the state court. Snap is filing all of the publicly available pleadings with this motion, and will seek leave of Court to seal and/or redact certain filings once Snap has been able to meet and confer with Plaintiff.

22

Respectfully Submitted,

DATED: March 21, 2026                        By: /s/ *Laura W. Duncan*

**KELLEY DRYE & WARREN LLP**
515 Post Oak Blvd., Suite 900
Houston, Texas 77027
Tel: (202) 342-8672
Fax: (713) 355-5001
Paul L. Singer*
Texas State Bar No. 24033197
Laura W. Duncan
Texas State Bar No. 24092366
Beth B. Chun*
Texas State Bar No. 24082700
Andrea L. DeLorimier*
Texas State Bar No. 24121226
Austin J. Del Priore*
Texas State Bar No. 24121225
psinger@kelleydrye.com
lduncan@kelleydrye.com
echun@kelleydrye.com
adelorimier@kelleydrye.com
adelpriore@kelleydrye.com
*Pro Hac Vice Applications forthcoming*

**HENRY HILL PLLC**
6801 Gaylord Parkway, Suite 400
Frisco, Texas 75034
Tel: (972) 755-0002
Fax: (972) 755-0004
Byron K. Henry
State Bar No. 24008909
bhenry@henryhilltx.com

23

**DUNN ISAACSON RHEE LLP**
401 Ninth Street, NW
Washington, D.C. 20004-2637
Tel: (202) 240-2900
L. Rush Atkinson*
Kyle Smith*
Lyle W. Gruby*
ratkinson@dirllp.com
ksmith@dirllp.com
lgruby@dirllp.com

11 Park Place
New York, NY 10007
Christine M. Ray*
cray@dirllp.com
*Pro Hac Vice Applications forthcoming

**ATTORNEYS FOR DEFENDANT SNAP INC.**

24

25

## CERTIFICATE OF SERVICE

I hereby certify that on March 21, 2026, a copy of the foregoing document was served via Electronic Mail on all counsel of record.


/s/ *Laura W. Duncan*
Laura W. Duncan
An Attorney for Defendant

25